826 P.2d 888

John Franklin PEARCE and Ethel Pearce, husband and wife, Plaintiffs–Appellants–Cross Respondents,

v.

Steven OLLIE, M.D.; and John and Jane Does I Through V, Whose True Names are Unknown, Defendants–Respondents.

and

Valley County Hospital, Cascade, Idaho, Defendant–Respondent, Cross Appellant,

and

John Moser, M.D., Defendant.

No. 17744.

Supreme Court of Idaho.

Boise term, January 1991.

Feb. 4, 1992.

E. Lee Schlender, Hailey, for plaintiffs-appellants-cross respondents.

Quane, Smith, Howard & Hull, Boise, for defendant-respondent Ollie. Elizabeth G. Roper argued.

Hawley, Troxell, Ennis & Hawley, Boise, for defendant-respondent, cross appellant Valley County Hosp. Joseph P. Langfield argued.

BAKES, Chief Justice.

John Pearce suffered a subarachnoid cerebral hemorrhage (stroke) at Cascade, Idaho, in January of 1984. Treatment for his condition was administered by the Valley County Hospital and Dr. John Moser and Dr. Steven Ollie, Cascade, Idaho, physicians. This medical malpractice action arises from that treatment.

After initial consultation, care and treatment at the hospital, and the passage of approximately 55 hours, Pearce was transferred to St. Alphonsus Hospital in Boise at the direction of Dr. Ollie. There he was treated by Dr. Patrick Cindrich, a neurosurgeon, and Dr. Richard Wilson, a neurologist. Mr. Pearce sustained severe and permanent physical and mental impairments from the subarachnoid cerebral hemorrhage.

In October of 1985, John Pearce and his wife Ethel initiated this action against Dr. Moser, Dr. Ollie, and Valley County Hospital. The complaint alleged that Valley County Hospital failed to properly treat Mr. Pearce, that the treating physicians,

Drs. Moser and Ollie, did not provide adequate neurological consultation, and that Mr. Pearce was transferred too late to St. Alphonsus. The plaintiffs contend that with earlier diagnosis and treatment Pearce would have suffered little or no impairment.

Before the case went to trial, the plaintiffs learned while taking depositions that defense counsel had engaged in *ex parte* interviews with Dr. Cindrich and Dr. Wilson without the knowledge or consent of Mr. Pearce. Both doctors conceded to having agreed with defense counsel to testify as expert witnesses on behalf of the defendants. The plaintiffs filed a motion seeking an order precluding the defendants from calling Dr. Cindrich and Dr. Wilson as witnesses, which the trial court denied.

The case was tried to a jury in Boise, and on March 24, 1988, the jury returned a verdict finding that only Dr. Moser was guilty of negligence in treating Mr. Pearce. Dr. Ollie was absolved of any negligence. The trial court entered judgment upon the verdict and the case against Dr. Moser was concluded by payment of $150,000, the amount of damages which the jury found that Mr. Pearce had sustained.

The Pearces have appealed from the district court's refusal to exclude the testimony of Drs. Cindrich and Wilson, from the final judgment of dismissal granted to Dr. Ollie, and also from the order denying their post-judgment motion for a new trial against the hospital and Dr. Ollie. During the trial, after the Pearces had rested their case in chief, Valley County Hospital moved for a directed verdict. The district court granted the motion and the hospital was dismissed from the action. Valley County Hospital cross-appeals from the directed verdict in its favor, asserting as a fall-back position its other defenses which the district court rejected in ruling on the motion for directed verdict. We conclude that the Pearces' appeal in this case should be dismissed. Thus, we need not reach the other issues raised by both parties.

As is readily apparent from the jury's verdict, which is attached as Appendix A, the jury determined Pearce's total damages, "which were proximately caused by the failure of the defendant(s)," to be $150,000. The trial court entered judgment on that verdict against Dr. Moser because he was the only defendant whom the jury found to be negligent. The total amount of damages suffered by the plaintiff, as found by the jury, was paid by Dr. Moser and accepted by the plaintiff. Accordingly, there is no basis for further proceedings in this case, and no basis for an appeal. *Walker v. Budzianowski*, 103 Idaho 244, 646 P.2d 1015 (1982) (Where defendant in personal injury action offered to tender full amount of damages and costs, plus interest, to plaintiff, questions raised by plaintiff on appeal were moot); *Bob Rice Ford, Inc. v. Donnelly*, 98 Idaho 313, 563 P.2d 37 (1977); *Radioear Corp. v. Crouse*, 97 Idaho 501, 547 P.2d 546 (1976).

Appeal dismissed. No costs or attorney fees awarded.

JOHNSON and McDEVITT, JJ., concur.

BOYLE, J., concurs specially.

# APPENDIX A

MAR 24 1988
JOHN ..... Clerk
By ........

IN THE DISTRICT COURT OF THE FOURTH JUDICIAL DISTRICT OF THE STATE OF IDAHO, IN AND FOR THE COUNTY OF VALLEY

JOHN FRANKLIN PEARCE and ETHEL PEARCE, husband and wife,

    Plaintiffs,

vs.

STEVEN OLLIE, M.D., and JOHN MOSER, M.D.,

    Defendants.

Case No. V.C. 28

SPECIAL VERDICT

We, the jury, answer the questions submitted to us in the Special Verdict as follows:

QUESTION NO. 1. Did Dr. Steven Ollie fail to adhere to the applicable local standard of care in his treatment of John Franklin Pearce in January of 1984, and if so, was this failure a proximate cause of damage or injury to the plaintiffs?

    Yes____ No √

QUESTION NO. 2. Did Dr. John Moser fail to adhere to the applicable local standard of care in his treatment of John Franklin Pearce in January of 1984, and if so, was this failure a proximate cause of damage or injury to the plaintiffs?

    Yes √ No____

SPECIAL VERDICT - 454

If you have answered both Question No. 1 and Question No. 2 "no," you are done. Sign the verdict form as instructed, and advise the bailiff. If you have answered either Question No. 1 or Question No. 2. or both "yes," then answer Question No. 3.

QUESTION NO. 3. What are the total damages suffered by the plaintiffs which were proximately caused by the failure of the defendant(s)?

    John Franklin Pearce    $ 150,000

    Ethel Pearce    $ 0

If you have answered either Question No. 1 or Question No. 2 "no" you are done. Sign the verdict form as instructed, and advise the bailiff. If you have answered both Question No. 1 and Question No. 2 "yes," answer Question No. 4 and Question No. 5.

QUESTION NO. 4. With respect to the liability of Dr. Steven Ollie, what portion of the total damages determined in Question No. 3 do you assess against this defendant with respect to:

    (a) John Franklin Pearce:
        The entire amount
        or
        $____ of the amount in Question No. 3.

    (b) Ethel Pearce:
        The entire amount
        or
        $____ of the amount in Question No. 3.

SPECIAL VERDICT - 455

QUESTION NO. 5. With respect to the liability of Dr John Moser, what portion of the total damages determined in Question No. 3 do you assess against this defendant with respect to

    (a) John Franklin Pearce:
        The entire amount
        or
        $____ of the amount in Question No. 3.

    (b) Ethel Pearce:
        The entire amount
        or
        $____ of the amount in Question No. 3.

Dated this 17 day of March, 1988.

FOREMAN

SPECIAL VERDICT - 456

BOYLE, Justice specially concurring.

I concur with the majority in dismissing the appeal. However, I register my genuine concern over an issue not addressed by the lead opinion. In this case defense counsel made ex parte contact with the patient's treating physician. I am opposed to such a practice because I.C. § 9–203(4)(C) clearly provides that a "physician or surgeon cannot, without the consent of his patient, be examined in a civil action" regarding the patient's medical condition *except* that the physician may provide "testimony" if the patient brings an action which puts his or her condition at issue. Defense counsel can subpoena any of plaintiff's physicians to testify in a pretrial deposition or at trial. In my view, ex parte contact of a patient's treating physician by defense counsel is in clear violation of I.C. § 9–203(4)(C). To the extent that the dissent of Bistline, J., is critical of ex parte contact of treating physicians by defense counsel, other than that expressly allowed by the statute, I agree.

BISTLINE, Justice, concurring in part, dissenting in part.

## PART I.   BACKGROUND

When oral argument was heard on Monday, January 7, 1991, we clearly understood that the determinative issue presented was the validity, or the impropriety, as the case might be, of defense counsel's non-consensual contact with and interview of Dr. Cindrich and Dr. Wilson, and of retaining those treating physicians as expert witnesses to testify on behalf of the defense at trial. There is no disputing that they were so retained, although the details of the agreement are not readily found in the record.[1] Of course, payment is a matter of agreement between defense counsel and their witness, other than that first, *the plaintiff/patient must consent* to defense counsel's contacting his physicians. Neither Frank Pearce nor his wife were asked for consent, and they gave no consent.

There is no dispute that the two doctors did testify at trial on behalf of the defense. Most legally trained minds would concede that such in-person testimony would be extremely persuasive with a jury. Other than for defense counsel's unprecedented conduct in retaining Wilson and Cindrich as the primary expert witnesses, in the normal course of events they would have been plaintiffs' witnesses. As a natural consequence of the physician's having accepted employment by defense counsel, plaintiffs' counsel did not attempt to call either doctor to testify on behalf of Frank Pearce.

So far as is known, this was the first instance in Idaho where there has occurred an outright usurpation of a patient's treating doctors by defense counsel in flagrant violation of the confidential relationship between doctor and patient, the doing of which is prohibited by I.C. § 9–203(4), *other than where the patient consents thereto.* That statute and/or its predecessors is neither new nor unknown, dating back in history to territorial days.

Having previously had the benefit of opposing briefs, we came away from the oral argument well aware that the singularly decisive issue to be resolved by this Court was the validity of Judge McKee's order which denied plaintiffs' *in limine* motion seeking to preclude both Dr. Wilson and Dr. Cindrich from testifying as experts on behalf of the defendant physicians Dr. Ollie and Dr. Moser. In response to this motion for an *in limine* order, Judge McKee gave his ruling in a written memorandum decision:

> In the course of evaluating the plaintiff while he was hospitalized in Cascade, the defendant Ollie consulted via telephone with Dr. Richard Wilson, a neurologist in Boise. Subsequently, and consistent with the opinion of Dr. Wilson, the plaintiff was transferred to St. Alphonsus R.M.C. in Boise, where he was operated upon by Dr. Patrick Cindrich, a neurosurgeon.

---

1. Dr. Wilson did testify to a standard charge of $500 per hour for deposition testimony, from which it can be presumed that his hourly fee for a court appearance would be no less than $500 per hour.

Plaintiff has now filed the instant malpractice action against the two physicians in Cascade, Drs. Moser and Ollie, and the Valley County Hospital. Apparently, during trial preparation, attorneys for the defendants discussed the case with both Dr. Wilson and Dr. Cindrich. In early discovery, the defendants listed both of these doctors as defense experts on issues pertaining to the substantive treatment afforded plaintiff by the defendants and upon the relevant local standard of care. At a later date, plaintiff's counsel deposed both Dr. Wilson and Dr. Cindrich. Following these depositions, and apparently upon learning thereby that these doctors were prepared to testify adversely to plaintiff's position, plaintiff filed the instant motion to bar their testimony.

*Plaintiff bases his motion upon grounds that Drs. Wilson and Cindrich are subject to a fiduciary duty to the plaintiff, and that they ought not be permitted to testify adversely to him. Plaintiff further contends that defense counsel acted improperly in discussing the case with these doctors ex parte, and then in retaining them as defense experts.* Plaintiff's argument is not persuasive.

The information and opinions possessed by Drs. Wilson and Cindrich are not privileged. I.R.E. 503(d) excepts from any physician-patient privilege matters placed in issue by the patient. Absent a privilege, I am persuaded that the rationale of *Doe v. Eli Lilly & Co.,* 99 F.R.D. 126 ([D.D.C.] 1983) is the better reasoned view:

"... no party to litigation has anything resembling a proprietary right to any witness's evidence. Absent a privilege no party is entitled to restrict and opponent's access to a witness, however partial or important to him, by insisting upon some notion of allegiance."

I find the Illinois authority cited by the plaintiff, *Karten [Karsten] v. McCray,* [157 Ill.App.3d 1, 109 Ill.Dec. 364], 509 N.E.2d 1376 (Ill.App.1987) and *Yates v. El-Deiry,* [160 Ill.App.3d 198, 112 Ill.

Dec. 105], 513 N.E.2d 519 (Ill.App.1987), to be unpersuasive. The conclusion of the Illinois court that a party may not obtain through informal means what would be available through formal discovery, and that the remedy for transgression is the exclusion of such evidence so tainted, is not supportable.

Instead, I am persuaded by the views expressed in other jurisdictions to the effect that all parties have free access to all evidence not privileged, however such may be acquired. *Lazorick v. Brown,* [195 N.J.Super. 444], 480 A.2d 223, (N.J., 1984); *TransWorld Investments v. Drobny,* 554 P.2d 1148 (Alaska, 1976); *Stufflebam v. Applequist [Appelquist],* 694 S.W.2d 882 (Mo.App., 1985).

The ethical opinions cited by the plaintiff are not in point. This is not a case where defense counsel have invaded a privileged area or infringed upon an expert previously retained by the plaintiff for litigation purposes.

I therefore decline to revisit my ruling. Plaintiff's motion to exclude the testimony of Drs. Wilson and Cindrich will remain denied. This memorandum shall constitute the order of the court.

R., Vol. 11, 292–294 (emphasis added).

## PART II.

Other than is illustrated in the dissent which follows, I have no disagreement with the opinion for the Court, and to that limited extent, I concur therein.

## PART III.  DISSENTING

The Court has now an opinion which presently has sufficient votes for issuance, with which I am unable to agree. Its *ratio decidendi,* at least a model of brevity at three sentences, is:

As is readily apparent from the jury's verdict, which is attached as Appendix A, the jury determined Pearce's total damages, 'which were proximately caused by the failure of the defendant(s),' to be $150,000. The trial court entered judgment on that verdict against Dr. Moser because he was the only defendant whom

the jury found to be negligent. The total amount of damages suffered by the plaintiff, as found by the jury, was paid by Dr. Moser and accepted by the plaintiff. Accordingly, there is no basis for further proceedings in this case, and no basis for an appeal.

Opinion at 540, 826 P.2d at 889. It is not disputed that a tunnel-vision reading of the jury verdict could yield that interpretation. To so read the Court's opinion, however, resort must be made to ignoring the set of parentheses which encase the "(s)" in the word "defendant(s)." But even that does not serve to justify the majority's conclusion that "there is no reason for further proceedings in this case, *and no basis for an appeal.*" A fair and more realistic reading of the jury verdict form is that because the jurors concluded that only Dr. Moser was negligent, the $150,000 damage award assessed by the jury is the total amount of damages caused the Pearces *by Dr. Moser's* negligence. The jury did not find Dr. Ollie liable as to any damages whatsoever, from which it follows that the $150,000 damage award could only apply to Dr. Moser. Therefore, the liability of Dr. Ollie is susceptible to being tried a second time. If the plaintiffs do not prevail on liability in a second trial, Dr. Ollie is home free.

The majority's willingness to *assume* that the $150,000 award was for "the total damages suffered by the plaintiffs ... caused by the ... defendant(s)," is troublesome. The only defendants to whom that question referred were Dr. Moser and Dr. Ollie. Both plaintiffs, Frank and Ethel Pearce, claimed damages. With insufficient guidance from the trial court, it cannot be said whether the jury did or did not read that question in the verdict form as

setting *Frank* Pearce's total damages at $150,000, and Ethel Pearce's total damages at zero.

The reading of the verdict by the majority, i.e., that the verdict was a determination of the total damages to Frank and Ethel Pearce is not soundly premised, especially in ignoring that Ethel Pearce received *nothing.* It equally disregards that the total damages question, question no. 3 which reads, "[w]hat are the total damages suffered by the plaintiffs which were proximately caused by the defendant(s)?," refers back to questions 1 and 2, both of which asked whether each doctor was negligent, and no more. The jury responded that only Dr. Moser was at fault. Total damages, then, were not inclusive of *both doctors' negligence.* Judge McKee essentially instructed the jurors that if the jury found *both* defendant doctors negligent, then the plural defendants would be applicable. Obviously, where only one doctor was found liable, the "s" was mere surplusage, but the directive of the special verdict did *not* so advise the jurors.[2] There is no doubting that in encountering the words, "[w]hat are the total damages suffered by the plaintiffs which were proximately caused by the defendant(s)?" the majority has elected to strike the parenthesis symbols encasing the letter "s."

The total damages were rendered against only Dr. Moser. There is no monetary award against Dr. Ollie, and he has paid no damages as a result of the trial. Accordingly, there is no obstacle preventing the plaintiffs from trying Dr. Ollie's alleged negligence in a new trial which will be as to him only, and where *Dr. Ollie's attorneys will be properly precluded from utilizing Pearce's treating physicians as witnesses*

---

**2.** It does not require a Brandeis acumen to understand that the special verdict was drafted with the thought in mind that, at the time the case was submitted to the jury, there were two defendants, both alleged to have been negligent. There being only two defendants, the first decision made by the jury was to answer "no" to the inquiry of question no. 1, absolving Dr. Ollie of causative negligence. At that time, although the jurors probably did not so realize, Dr. Ollie,

absent district court intervention, was exonerated and out of the case other than to await judgment on the verdict, and incidentally to collect any costs and fees incurred in his defense. It follows that when the jurors reached question no. 3, "What are the total damages suffered by the plaintiffs which were proximately caused by the failure of the defendant(s)?" the award of $150,000 had no application to any liability other than that attributed to Dr. Moser.

*for the defense.*[3] Where the majority goes astray is in putting out of mind the fact that the defendant doctors were sued as individual defendants, and not as a two-man team, nor as a partnership, nor in any incorporated capacity. Plaintiffs joined them for purposes of trial, a proposition which either of the doctors or other defendants could have challenged, but did not. Judge McKee himself wrote, *"Here, the plaintiff sued three defendants, asserting separate theories of negligence and liability against each. Each was represented by separate counsel."* R. 509 (emphasis added). Theories of liability differed as to each doctor.

This Court is presented with a clear cut opportunity to inhibit a defense counsel course of conduct which has been condemned by an overwhelming majority of the courts in all jurisdictions which have addressed the the issue. The foregoing statement is made without hesitation only after an extensive research of authority, which endeavor consumed weeks rather than days, and which resulted in an opinion which, if joined, would have halted a practice in the legal community which had not been previously brought to the Court's attention. As a result of the opinion for the Court which puts the stamp of approval on that practice will, like Topsy, grow, and grow, and grow, to the denigration of the respectability of the practice of law in Idaho, far more than did the advent of advertising.

By any standard of review, Judge McKee's ruling which released defense counsel from the statutory requirement of "hands-off" of plaintiffs' treating physicians was clearly inimical to the plaintiffs' lawsuit. Because it was erroneous, there must be a second trial. Had the jury verdict absolved both Drs. Moser and Ollie from liability, this Court would have been hard put not to grant a new trial. It could not be other than prejudicial, highly prejudicial and improper, for the plaintiffs *to have been deprived of the testimony of their treating physicians*—accomplished by the stealthy defense procedure in bringing both into the defense encampment. As stated elsewhere, there was some financial gain for the doctors, which pales to nothing when compared to the destructive effect on plaintiffs' case. There is no knowing how much was paid to Dr. Wilson and Dr. Cindrich, but it is a matter of record that Judge McKee awarded Dr. Wilson $2832.31, and Dr. Cindrich $3400.00, as witness fees. On the other end of the balance scales, plaintiff Ethel Pearce ended with nothing except a physically injured shell of her wholly disabled husband.

The aforementioned suggestion, to the effect that the respondents could have moved for dismissal, apparently had considerable appeal, because in a short time it had three concurrences, and the consensus was presumably to dismiss the appeal with an opinion lacking a *ratio decidendi*. Presumably this was preferred over an opinion denouncing the actions of defense counsel in making a nonconsensual contact with plaintiff's treating physicians, and worse yet, retaining their services as expert witnesses. Today the trial bench and bar are favored with this Court's judgment which

---

**3.** This justice would more readily accept the majority's opinion if it assessed the strength of the defendants' case in the absence of the pilfered witness testimony. However, the majority does not attempt to assert that the plaintiffs would not have won their case against both Dr. Ollie and Dr. Moser even if the defendants had not stolen the plaintiffs' physicians. Indeed, they could not assert such a proposition with any degree of confidence; without Dr. Cindrich and Dr. Wilson, the sole defense witness would have been Dr. Cantril Nielsen, a psychiatrist, whose testimony largely pertained to the mental competency of Dr. Moser. That testimony was not for application to the issue of Dr. Moser's negligence, but on a defense motion asking Judge McKee's ruling that Dr. Moser was incompetent to testify at the taking of his pretrial deposition. The defense of Dr. Ollie was based entirely on the testimony of Dr. Wilson and Dr. Cindrich, who were Frank Pearce's treating physicians. Both physicians testified extensively, as is disclosed by going to the record. Mr. Quane's direct examination of Dr. Cindrich filled eighty-two pages of direct examination. His redirect of Dr. Cindrich was four pages. His examination of Dr. Wilson encompassed ninety-six pages plus an additional twenty-two pages of redirect. Mr. Gjording, also for the defendants, encompassed four pages of examination, and eleven pages of examination of defendants.

effectuates that consensus by the majority. Pandora's box is open until and unless the legislature intervenes.

Not one word appears in the majority opinion by which the majority even attempts to justify the Court's untoward and precipitous conduct in taking unto itself the authority to *sua sponte* dismiss the appeal without pausing to request or allow involved counsel to be heard. Furthermore, the cases cited by the majority in support of that proposition do not lend credence to it. Each one is distinguishable from the present set of facts. The case now before us is very much unlike the scenario in *Walker v. Budzianowski*, 103 Idaho 244, 646 P.2d 1015 (1982), where the only issue on appeal was genuinely mooted by the defendant's actions.[4]

In the second case relied upon by the majority, *Bob Rice Ford, Inc. v. Donnelly*, 98 Idaho 313, 563 P.2d 37 (1977), judgment had been entered at trial against Donnelly, the defendant, in favor of Bob Rice Ford. Subsequently, Donnelly deposited with the district court the amount of the judgment as well as authorizing its release to Bob Rice Ford. This Court dismissed a later appeal by Donnelly, holding that since he had fully satisfied the judgment *against* him the case was moot. The law is relatively clear that when defendant Donnelly affirmatively satisfied the judgment against him, all further proceedings in the lawsuit ended. To the contrary, when the Pearces accepted Dr. Moser's satisfaction of judgment, they admitted nothing as to how it related to Dr. Ollie.

Finally, *Radioear Corp. v. Crouse*, 97 Idaho 501, 547 P.2d 546 (1976), involved a suit for a debt allegedly owed by Crouse. Crouse made no appearance and judgment was entered against him because he failed to appear to defend the case. Crouse learned of the default judgment only on locating a judgment lien during a title search of his real property. He petitioned to have it set aside. In order to sell his property in the meantime, Crouse deposited funds with the court, pursuant to I.C. § 10-1115, in order to satisfy the judgment and thus remove the cloud on his title. Plaintiff Radioear contended that by doing so, Crouse was making an election of remedies and so was precluded from attacking the judgment. This Court held that Crouse's depositing of the funds with the clerk of court was not inconsistent with an assertion of the right to move to vacate the judgment.

In the case before us, as in *Radioear*, it is similarly not inconsistent for the Pearces to accept the money judgment from defendant Dr. Moser, whom the jury found clearly negligent, while at the same time pursuing a new trial free of the objectionable tactics of defense counsel in retaining the Pearces' treating physicians as expert witnesses. As to Dr. Moser, the proceedings are complete; Frank and Ethel Pearce do not dispute that. They simply wish to try their case against Dr. Ollie without defense counsel's use of Frank Pearce's treating physicians' testimony on behalf of Dr. Ollie.

A ready response to the notion that the appeal has to be dismissed because the plaintiffs accepted the $150,000 which the jury awarded Frank Pearce, is that no one can possibly know what might be the outcome if there were to be a new trial solely against Dr. Ollie, and no one else. A question to be asked is: Had the jury returned a verdict of no liability as to both Dr. Ollie and Dr. Moser, would the plaintiffs be entitled to appeal in pursuit of a grant of a new trial at which the defendants and de-

---

4. In *Walker*, the plaintiff sought damages from Budzianowski for personal injuries suffered when Budzianowski's vehicle struck Walker's stationary vehicle in the rear. Walker's damages were $1023.30, but because the jury apportioned the negligence between the plaintiff and defendant, the resulting judgment in favor of Walker entered by the trial court was for $521.88 plus costs. However, after entry of judgment, the parties stipulated that it be vacated and an amended judgment be entered to reflect that Budzianowski had tendered into the district court the entire $1023.30. Since the *only* issue appealed by Walker was the trial court's instructions on comparative negligence and whether the evidence supported a jury finding that Walker was 49% negligent, it was truly mooted upon Budzianowski's offer to pay the entire amount requested by Walker.

fense counsel would be barred from using Dr. Wilson and Dr. Cindrich as witnesses for the defense? Answer: Yes, they would be so precluded, provided that two members of the Court share my view that this Court should endeavor to banish such conduct. Otherwise a second trial would be futile.

The prejudice done to the plaintiffs is readily apparent to any trial attorney, even one of limited experience. First, plaintiffs were deprived of calling both Dr. Wilson and Dr. Cindrich as witnesses because both had been retained as expert defense witnesses. If the plaintiffs' counsel were so foolish as to risk calling Dr. Cindrich or Dr. Wilson to testify at presentation of the plaintiffs' case, defense counsel would have had a field day on cross-examination. Any and all manner of leading questions and suggestive questions would be the day's bill-of-fare spoon fed to the witnesses by defense counsel. Cross-examination is much like open season. The Pearces are entitled to a new trial wherein Dr. Wilson and Dr. Cindrich would be precluded from testifying as experts for the defense. The trial which we review was not a fair trial. Because of Judge McKee's ruling the ensuing trial was tainted even before it commenced by the maneuvers of defense counsel in retaining Dr. Wilson and Dr. Cindrich as expert witnesses for the defendants.

Additionally, the jury damage award to Ethel Pearce was zero, clearly an unacceptable state of affairs. Paragraph XII of the Pearces' complaint alleged loss of consortium. Although there may be some who scoff, loss of consortium has long been a recognized cause of action in Idaho, and the total absence of an award for the claim is reason enough for the Pearces to have a second trial wherein that issue is again submitted to a jury.

In just the last ten years the Court has had two such cases before it. The more recent one was *McDonald v. Safeway Stores*, 109 Idaho 305, 707 P.2d 416 (1985). Mrs. McDonald was the physically injured spouse, and the McDonalds' joint complaint contained a claim for her general and special damages in the amount of $300,000, as well as her husband's claim for loss of consortium, services, care, comfort and companionship. The case went to trial, and the jury awarded damages to Mrs. McDonald in the sum of $196,000, and to Mr. McDonald for his loss of consortium the sum of $35,000. Both awards were upheld on appeal in a unanimous opinion by this Court.

Just one year previously, a similar case was presented to us in *Runcorn v. Shearer Lumber Co.*, 107 Idaho 389, 690 P.2d 324 (1984). Mr. Runcorn's damages were set by the jury at the sum of $825,000. For Mrs. Runcorn's loss of consortium claim, the jury awarded damages in the sum of $100,000, and judgment in that amount was entered by Judge Schilling, who was not convinced by Shearer Lumber Company to reduce either amount. On appeal to this Court both judgments were affirmed, except for our unanimous conclusion that the district court should reduce the loss of consortium award by ten percent to account for Mr. Runcorn's comparative negligence set by the jury at ten percent. Mr. Runcorn's judgment also was directed to be reduced by the sum of $22,031.99, because he had received that amount in worker's compensation benefits.

In sum, loss of consortium is indeed a viable cause of action, and a claim which is not dependent on the amount awarded to the injured person. If any evidence on that issue supported Mrs. Pearce's claim, then the jury improperly and without basis returned an unacceptable verdict on that claim. Her testimony on direct and redirect examination (a total of 464 pages of transcript) clearly illustrated substantial damage for loss of consortium and her entitlement to considerably more than nominal damages. Yet, the jury said "zero" and the court accepted the verdict. It would be a welcome sign to know that I am not the only one who has perused her testimony. The complaint did not purport to list the particulars, nor was it necessary to do so. The complaint stated that such would be established at trial, and Ethel Pearce fulfilled that promise. There is no doubt that a verdict of zero cannot stand in

this case. The Pearces are entitled to a new trial.

Having fulfilled my obligation as assigned author to write an opinion for the Court, undertaken only after examining the district court's denial of plaintiffs' motion for an *in limine* order, it is now for each justice to decide whether to breathe life into this opinion by concurring, or not doing so, and if not, thus endorsing approval of Judge McKee's decision turning defense counsel free to purloin any plaintiff's treating physicians and in the bargain implicitly relegating I.C. § 9–203(4) to the scrap heap. If not now, then at some later time, perhaps a more enlightened Court will see fit to dust off the opinion and put it to the good use for which it was intended. Accordingly it follows, other than that those parts wherein the majority view and my view coincide are omitted [5]:

## PART IV. PROPOSED, BUT REJECTED, MAJORITY OPINION of BISTLINE, J.

John Pearce suffered a subarachnoid cerebral hemorrhage at Cascade, Idaho in January of 1984. This medical malpractice action arises from the treatment administered by the Valley County Hospital, and Dr. John Moser and Dr. Steven Ollie, resident physicians. After initial consultation, care and treatment at the hospital, and the passage of approximately 55 hours, Pearce was transferred to St. Alphonsus Hospital in Boise at the direction of Dr. Ollie. There he was treated by Dr. Patrick Cindrich, a neurosurgeon, and Dr. Richard Wilson, a neurologist. Mr. Pearce sustained severe and permanent physical and mental impairments from the subarachnoid cerebral hemorrhage.

In October of 1985, John Pearce and his wife Ethel initiated this action against Dr. Moser, Dr. Ollie, and Valley County Hospital. The complaint alleged: failure to properly treat Mr. Pearce by Valley County; that neurological consultation was not properly obtained by the treating physicians; and that Mr. Pearce was transferred too late to St. Alphonsus. Plaintiffs contend that with earlier diagnosis and treatment Pearce would have suffered little or no impairment.

The case was tried to a jury in Boise, and on March 24, 1988, the jury returned a verdict finding Dr. Moser committed malpractice. Judgment upon the verdict was entered and the case against Dr. Moser was settled by payment of the judgment. The jury's verdict absolved Dr. Ollie of any negligence.

During the trial, and after the Pearces had rested their case in chief, Valley County Hospital moved for a directed verdict. The district court granted the motion and the Hospital was dismissed from the action. The Pearces have appealed from the final judgment of dismissal granted to Dr. Ollie, and also from the order denying their postjudgment motion for a new trial against the Hospital and Dr. Ollie. Valley County Hospital cross-appeals from the directed verdict in its favor, asserting as a fall-back position its other defenses which the district court rejected in ruling on the motion for directed verdict.

## A. DEFENDANTS' EX PARTE INTERVIEWS WITH PLAINTIFF'S TREATING PHYSICIANS

An issue of first impression in this jurisdiction is whether the testimony of Dr. Cindrich and Dr. Wilson should have been precluded because of defense counsel's having engaged them in non-consensual ex parte interviews. This information was not learned until depositions were being taken. Both doctors conceded to having agreed to testify as expert witnesses on behalf of defendants. The district court denied plaintiffs' motion for an order precluding the defendants from utilizing Dr. Cindrich and Dr. Wilson as witnesses, doing so by means of a written memorandum decision:

> In the course of evaluating the plaintiff while he was hospitalized in Cascade, the defendant Ollie consulted via telephone with Dr. Richard Wilson, a neurologist in Boise. Subsequently, and consistent with the opinion of Dr. Wilson,

5. Deleted from my proposed majority opinion are Parts II, III, and IV.

the plaintiff was transferred to St. Alphonsus R.M.C. in Boise, where he was operated upon by Dr. Patrick Cindrich, a neurosurgeon.

Plaintiff has now filed the instant malpractice action against the two physicians in Cascade, Drs. Moser and Ollie, and the Valley County Hospital. Apparently, during trial preparation, attorneys for the defendants discussed the case with both Dr. Wilson and Dr. Cindrich. In early discovery, the defendants listed both of these doctors as defense experts on issues pertaining to the substantive treatment afforded plaintiff by the defendants and upon the relevant local standard of care. At a later date, plaintiff's counsel deposed both Dr. Wilson and Dr. Cindrich. Following these depositions, and apparently upon learning thereby that these doctors were prepared to testify adversely to plaintiff's position, plaintiff filed the instant motion to bar their testimony.

Plaintiff bases his motion upon grounds that Drs. Wilson and Cindrich are subject to a fiduciary duty to the plaintiff, and that they ought not be permitted to testify adversely to him. Plaintiff further contends that defense counsel acted improperly in discussing the case with these doctors *ex parte,* and then in retaining them as defense experts....

The information and opinions possessed by Drs. Wilson and Cindrich are not privileged. I.R.E. 503(d) excepts from any physician-patient privilege matters placed in issue by the patient. (Even) absent a privilege, I am persuaded that the rationale of *Doe v. Eli Lilly & Co.,* 99 F.R.D. 126 (D.D.C.1983) is the better reasoned view:

> ... no party to litigation has anything resembling a proprietary right to any witness's evidence. Absent a privilege no party is entitled to restrict an opponent's access to a witness, however partial or important to him, by insisting upon some notion of allegiance.

I find the Illinois authority cited by the plaintiff, *Karsten v. McCray,* 157 Ill. App.3d 1, 109 Ill.Dec. 364, 509 N.E.2d 1376 (1987), and *Yates v. El–Deiry,* 160 Ill.App.3d 198, 112 Ill.Dec. 105, 513 N.E.2d 519 (1987), to be unpersuasive. The conclusion of the Illinois court that a party may not obtain through informal means what would be available through formal discovery, and that the remedy for transgression is the exclusion of such evidence so tainted, is not supportable.

Instead, I am persuaded by the views expressed in other jurisdictions to the effect that all parties have free access to all evidence not privileged, however such may be acquired. *Lazorick v. Brown,* 195 N.J.Super. 444, 480 A.2d 223 (1984); *TransWorld Investments v. Drobny,* 554 P.2d 1148 (Alaska 1976); *Stufflebam v. Appelquist,* 694 S.W.2d 882 (Mo.App. 1985).

The ethical opinions cited by the plaintiff are not in point. This is not a case where defense counsel have invaded a privileged area or infringed upon an expert previously retained by the plaintiff for litigation purposes.

I therefore decline to revisit my ruling. Plaintiff's motion to exclude the testimony of Drs. Wilson and Cindrich will remain denied. This memorandum shall constitute the order of the court.

Because this is an issue of first impression in Idaho, and also a very important issue, we necessarily must look not only to holdings in the six cases examined by the district court, but to other jurisdictions which have passed upon that issue. In engaging in that exercise we naturally turn first to our neighboring states, then to the other western states, and work our way eastward.

Just three years ago, in June 1988, the Washington Supreme Court was confronted with the exact same issue and reached a decision signed by all nine of the justices. *See Loudon v. Mhyre,* 110 Wash.2d 675, 756 P.2d 138 (1988).[6] Because the Wash-

---

**6.** The underlying facts in *Loudon* were:

This is a wrongful death action brought by Robert Loudon, individually and as personal

ington court's prior ruling on that issue dated back to 1964, it conducted an extensive review of authority which had become available in the intervening twenty-four years:

> The jurisdictions which have addressed this issue are divided as to the appropriate answer. A number of courts have approved *ex parte* contact due to its advantages over depositions and the claimed unfair advantage given plaintiffs. *See Doe v. Eli Lilly & Co.,* 99 F.R.D. 126 (D.D.C.1983); *Trans–World Inv. v. Drobny,* 554 P.2d 1148 (Alaska 1976); *Langdon v. Champion,* 745 P.2d 1371 (Alaska 1987); *Green v. Bloodsworth,* 501 A.2d 1257 (Del.Super.Ct.1985); *State ex rel. Stufflebam v. Appelquist,* 694 S.W.2d 882 (Mo.App. 1985); *Stempler v. Speidell,* 100 N.J. 368, 495 A.2d 857 (1985). We decline to adopt the rule of these cases. We find that the burden placed on defendants by having to use formal discovery is outweighed by the problems inherent in *ex parte* contact. *See Alston v. Greater S.E. Comm'ty Hosp.,* 107 F.R.D. 35 (D.D.C.1985); *Petrillo v. Syntex Labs, Inc.,* 148 Ill.App.3d 581, 102 Ill.Dec. 172, 499 N.E.2d 952 (1986), *appeal denied,* 113 Ill.2d 584, 106 Ill.Dec. 55, 505 N.E.2d 361, *cert. denied sub nom. Tobin v. Petrillo,* 483 U.S. 1007, 107 S.Ct. 3232, 97 L.Ed.2d 738 (1987); *Roosevelt Hotel Ltd. Partnership v. Sweeney,* 394 N.W.2d 353 (Iowa 1986); *Wenninger v. Muesing,* 307 Minn. 405, 240 N.W.2d 333 (1976); *Smith v. Ashby,* 106 N.M. 358, 743 P.2d 114 (1987); *Nelson v. Lewis,* 130 N.H. 106, 534 A.2d 720 (1987); *Anker v. Brodnitz,* 98 Misc.2d 148, 413 N.Y.S.2d 582 (Sup. Ct.), *aff'd mem.,* 73 A.D.2d 589, 422 N.Y.S.2d 887 (App.Div.1979).

*Loudon,* 110 Wash.2d at 677, 756 P.2d at 140 (footnote omitted).[7]

The Washington court in *Loudon* considered all of those cases examined by the district judge in our case, Judge McKee, excepting only *Lazorick v. Brown,* 480 A.2d at 223, *Karsten v. McCray,* 109 Ill.

---

representative of the estate of his son, David Loudon, involving malpractice claims against Drs. James Mhyre and Gerald Kenny. Drs. Mhyre and Kenny treated David for liver and kidney damage received in an automobile accident in Washington on December 14, 1985. Believing David's condition to be improving, the doctors released him from the hospital the following week. Upon return to his home in Oregon, however, David suffered complications and died on January 21, 1986.

Prior to his death, David received treatment from two Oregon health care providers. Loudon voluntarily provided Mhyre and Kenny with the medical records from those institutions. Defense counsel then moved for an order declaring that the physician-patient privilege had been waived and authorizing ex parte communication with David's treating physicians in Oregon.

Relying on *Kime v. Niemann,* 64 Wash.2d 394, 391 P.2d 955 (1964), the trial court ruled that the privilege had been waived but that *ex parte* contact was prohibited. The court ordered that discovery could be had only through the procedures provided in the court rules. The defendants appealed. We granted discretionary review and we affirm the order of the trial court.
*Loudon,* 110 Wash.2d at 676, 756 P.2d at 139.

7. Because the *Kime v. Niemann,* 64 Wash.2d 394, 391 P.2d 955, case was not squarely presented as an issue of a defense counsel's right, if any, to contact and interview the plaintiff's treating physician without having gained consent to do so from counsel representing the plaintiffs in pending litigation, that factor was most likely the beacon which guided the court into an exhaustive review of then current authority.

There had not been a trial or a court opinion issued in *Kime,* only an order. A state highway truck struck and injured Leslie Kime. Kime's response was to file a personal injury action against the driver and his employer, namely the state of Washington. The Superior Court was somehow persuaded to enter an order which stated that defendant's named counsel of record had a legal right to contact and question said doctors and institutions (hospitals or clinics) and to view records and x-rays pertaining to the condition of Leslie Kime. The order further provided that defense counsel did not need the consent of Kime or his attorneys in order to conduct the interviews and receive information. The Superior Court on petition for certiorari, granted review and set aside the order, stating, "We will not, on this record, pass on the question of when and under what circumstances a patient will be deemed to have waived his privilege; but we do, for the reasons stated earlier in this opinion, direct that the 'Order' now before us for review be set aside." *Kime,* 391 P.2d at 957. That unique case had little similarity to the circumstances at issue which was presented to the Washington Superior Court twenty-four years later.

Dec. at 364, 509 N.E.2d at 1376, and *Yates v. El–Deiry,* 112 Ill.Dec. at 105, 513 N.E.2d at 519, which latter two Judge McKee found unpersuasive. Cases examined by the Washington Supreme Court also included additional citations favorable to the persuasions of Judge McKee, namely the recent cases of *Langdon v. Champion,* 745 P.2d 1371 (Alaska 1987); *Green v. Bloodsworth,* 501 A.2d 1257 (Del.Super.Ct.1985); and *Stempler v. Speidel,* 100 N.J. 368, 495 A.2d 857 (1985). Basing its decision on *all* thirteen of the pro and con cases cited in its opinion, plus five other cases, *Wright v. Group Health Hosp.,* 103 Wash.2d 192, 691 P.2d 564 (1984); *Phipps v. Sasser,* 74 Wash.2d 439, 445 P.2d 624 (1968); *Lockett v. Goodill,* 71 Wash.2d 654, 430 P.2d 589 (1967); *Randa v. Bear,* 50 Wash.2d 415, 312 P.2d 640 (1957); and *Smith v. Driscoll,* 94 Wash. 441, 162 P. 572 (1917); the Washington court concluded and ruled as follows:

> We hold that *ex parte* interviews should be prohibited as a matter of public policy. The physician-patient privilege prohibits a physician from being compelled to testify, without the patient's consent, regarding information revealed and acquired for the purpose of treatment. RCW 5.60.060(4). A patient may waive this privilege by putting his or her physical condition in issue. *See Randa v. Bear,* 50 Wash.2d 415, 312 P.2d 640 (1957); *Phipps v. Sasser,* 74 Wash.2d 439, 445 P.2d 624 (1968). Waiver is not absolute, however, but is limited to medical information relevant to the litigation. See CR 26(b)(1). The danger of an *ex parte* interview is that it may result in disclosure of irrelevant, privileged medical information. The harm from disclosure of this confidential information cannot, as defendants argue, be fully remedied by subsequent court sanctions. The plaintiff's interest in avoiding such disclosure can best be protected by allowing plaintiff's counsel an opportunity to participate in physician interviews and raise appropriate objections. We find the reasoning of the Iowa Supreme Court persuasive:

We do not mean to question the integrity of doctors and lawyers or to suggest that we must control discovery in order to assure their ethical conduct. We are concerned, however, with the difficulty of determining whether a particular piece of information is relevant to the claim being litigated. Placing the burden of determining relevancy on an attorney, who does not know the nature of the confidential disclosure about to be elicited, is risky. Asking the physician, untrained in the law, to assume this burden is a greater gamble and is unfair to the physician. We believe this determination is better made in a setting in which counsel for each party is present and the court is available to settle disputes.

*Roosevelt Hotel Ltd. Partnership v. Sweeney,* 394 N.W.2d at 357.

The defendants urge us to permit *ex parte* contact but allow plaintiff the opportunity to seek a protective order under CR 26(c) limiting or prohibiting such contact upon a showing of good cause. However, we foresee that a protective order would usually be sought by plaintiff's counsel which would involve the court system in supervision of every such situation. We reject such a procedure.

The mere threat that a physician might engage in private interviews with defense counsel would, for some, have a chilling effect on the physician-patient relationship and hinder further treatment. The relationship between physician and patient is 'a fiduciary one of the highest degree ... involv[ing] every element of trust, confidence and good faith.' *Lockett v. Goodill,* 71 Wash.2d 654, 656, 430 P.2d 589 (1967). This close confidential relationship is recognized by the Hippocratic Oath and in the ethical guidelines of the American Medical Association. '[W]e find it difficult to believe that a physician can engage in an *ex parte* conference with the legal adversary of his patient without endangering the trust and faith invested in him by his patient.' *Petrillo v. Syntex Labs., Inc.,* 148 Ill.App.3d at 595, 102 Ill.Dec. 172,

499 N.E.2d 952. The presence of plaintiffs counsel as the protector of a patient's confidences will allay the fear that irrelevant confidential material will be disclosed and preserve the fiduciary trust relationship between physician and patient. *Wenninger v. Muesing,* 307 Minn. at 411, 240 N.W.2d 333.

In addition, a physician has an interest in avoiding inadvertent wrongful disclosures during *ex parte* interviews. We recognize, without deciding, that a cause of action may lie against a physician for unauthorized disclosure of privileged information. *See Smith v. Driscoll,* 94 Wash. 441, 442, 162 P. 572 (1917) (dictum); Ward, *Pretrial Waiver of the Physician/Patient Privilege,* 22 Gonz.L.Rev. 59, 62–63 (1986–87); Annot., *Physician's Tort Liability, Apart from Defamation, for Unauthorized Disclosure of Confidential Information About Patient,* 20 A.L.R.3d 1109 (1968). The participation of plaintiff's counsel to prevent improper questioning or inadvertent disclosures enhances the accomplishment of the purpose of the physician-patient privilege by also providing protection to the physician.

We note also that permitting *ex parte* interviews could result in disputes at trial should a doctor's testimony differ from the informal statements given to defense counsel, and may require defense counsel to testify as an impeachment witness.

We are unconvinced that any hardship caused the defendants by having to use formal discovery procedures outweighs the potential risks involved with *ex parte* interviews. Defendants may still reach the plaintiff's relevant medical records, and the cost and scheduling problems attendant with oral depositions can be minimized (though perhaps not as satisfactorily) by using depositions upon written questions pursuant to CR 31. Moreover, plaintiffs counsel may agree to an informal interview with both counsel present. Furthermore, the argument that depositions unfairly allow plaintiffs to determine defendants' trial strategy does not comport with a purpose behind the discovery rules—to prevent surprise at trial.

Finally, the defendants argue that prohibiting *ex parte* contact with physicians is inconsistent with *Wright v. Group Health Hosp.,* 103 Wash.2d 192, 691 P.2d 564 (1984), and with the Washington State Bar Association Formal Ethics Opinion 180 (1985). *Wright* held (1) that the attorney client privilege would not, of itself, bar an opposing attorney from interviewing employees of a corporation so long as the inquiries concerned factual matters and not communications between the employee and the corporation's attorney; (2) current employees authorized to speak for a corporation would be considered 'Parties' with whom opposing counsel could not speak ex parte; and (3) opposing counsel could interview employees of the corporation *ex parte* so long as such employees were not authorized to speak for the corporation or in a management status. *Wright v. Group Health Hosp., supra,* was not concerned with the fiduciary confidential relationship which exists between a physician and patient. The unique nature of the physician-patient relationship and the dangers which *ex parte* interviews pose justify the direct involvement of counsel in any contact between defense counsel and a plaintiff's physician. Similarly, Ethics Opinion 180 states only that *ex parte* contact with physicians is not unethical, but it does not address the policy concerns which militate against such contact.

We hold that defense counsel may not engage in *ex parte* contacts with a plaintiff's physicians. The trial court's order is affirmed.

*Loudon,* 110 Wash.2d at 677–79, 756 P.2d at 140–42 (footnotes omitted).[8]

---

**8.** We pause to mention that Washington's *Loudon* was not available to court and counsel when Judge McKee entered his written memorandum decision and order denying plaintiffs' motion for an order precluding the defendants from utilizing plaintiffs' treating doctors as witnesses. That decision was rendered and filed on the 29th of January, 1988; *Loudon* was not

Turning to Idaho's neighboring state to the east, we see that the Montana Supreme Court had before it a case which is on all fours with the case before us. In *Jaap v. District Court of Eighth Judicial Dist.,* 191 Mont. 319, 623 P.2d 1389 (1981), Julie Jaap initiated a personal damage action against William Reeves for injuries suffered in an automobile accident. Defense counsel moved the court for an order which would permit it to hold *private* conferences with all of the medical persons who had examined Jaap with regard to the various alleged personal injuries. After hearing oral argument on the motion, the district court entered an order the essence of which held that the filing of the action waived the physician-patient relationship, and that as to all the physicians who had treated or would treat her, their status would be considered the same as any other witness who might be possessed of relevant information or knowledge.

On entry of that order, Julie Jaap, for the purpose of reversing that order, applied to the Montana Supreme Court for a writ of supervisory control and the Montana Supreme Court assumed jurisdiction to review the propriety of the order. The court noted that the district court's order on its face was inoffensive, adding, however, that all parties acknowledge that the intent of the order "was to permit private interviews between defense counsel and Julie Jaap's physicians and therapists." *Jaap,* 623 P.2d at 1390.

Montana then had in effect a waiver of privilege rule, Rule 35(b)(2), which in full provides:

> *Waiver of Privilege.*—Either by (1) requesting and obtaining a report of the examination ordered as provided herein, or by taking the deposition of the examiner, or by (2) commencing an action or asserting a defense which places in issue the mental or physical condition of a party to the action, the party examined or the party to the action waives any

privilege he may have in that action or any other action involving the same controversy, regarding the testimony of every person who has treated, prescribed, consulted, or examined or may thereafter treat, consult, prescribe or examine, such party in respect to the same mental or physical condition; but such waiver shall not apply to any treatment, consultation, prescription or examination for any mental or physical condition not related to the pending action. Upon motion seasonably made, and upon notice and for good cause shown, the court in which the action is pending, may make an order prohibiting the introduction in evidence of any such portion of the medical record of any person as may not be relevant to the issues in the pending action.

*Jaap,* 623 P.2d at 1391.

A much shorter but similar waiver provision has in Idaho been promulgated as a rule of evidence, I.R.E. 503(d)(3), which reads:

> Condition an element of claim or defense. There is no privilege under this rule as to a communication relevant to an issue of the physical, mental or emotional condition of the patient in any proceeding in which he relies upon the condition as an element of his claim or defense or, after the patient's death, in any proceeding in which any party relies upon the condition as an element of his claim or defense.

I.R.E. 503(d)(3). We also observe that both jurisdictions have promulgated discovery rules and that Rule 26(a) of the Montana Rules of Civil Procedure is worded exactly the same as Rule 26(a) of the Idaho Rules of Civil Procedure, other than that the Idaho version concludes with an additional sentence, "Unless the Court orders otherwise under subdivision (c) of this rule, the frequency of use of these methods is not limited." [9]

issued until June 9, 1988. However, even absent *Loudon,* there was abundant respectable authority which may not have been brought to the court's attention.

9. The reader is cautioned that there is no suggestion that the remainder of the Rule 26 subsections are as alike in the two jurisdictions as is Rule 26(a). There is no reason at this time for making that academic excursion.

The Montana court then said, as to the application of the rule:

There is no question but that under Rule 35(b)(2) M.R.Civ.P., as the same is promulgated in Montana, Julie Jaap, by commencing an action for damages for her personal injuries which placed in issue the mental and physical condition arising from the accident, waived any physician-patient privilege as to her mental or physical condition in controversy. Accepting as a premise that the physician-patient privilege has been waived, may the District Court, by way of discovery, order that defense counsel may engage in informal, private interviews with the physicians treating Julie Jaap for her alleged injuries?

Put another way, granting that plaintiff has waived any physician-patient privilege relating to her mental and physical condition in controversy, what limits, if any, circumscribe the power of the District Court in authorizing and enforcing discovery under the Montana Rules of Civil Procedure?

Although we agree with that portion of the District Court order which stated that once the physician-patient privilege has been waived, the physician is to be considered as any other witness, we conclude that the District Court does not have power, under the rules of discovery, to order private interviews between counsel for one party and possible adversary witnesses, expert or not, on the other. We derive this conclusion from an examination of the Rules of Civil Procedure relating to discovery.

The methods by which discovery may be obtained, under the Montana Rules of Civil Procedure, are set out in Rule 26(a).

*Jaap*, 623 P.2d at 1391.

The rule was set out, following which the court stated with subtle emphasis, "Obviously a private interview of an adversary witness is not one of the 'methods' of discovery for which the Rules of Civil Procedure provide." *Jaap*, 623 P.2d at 1391. We deem it clear that Idaho Rule of Evidence 503(d)(3), Exceptions [to entitlement of the claim of privilege], is the equivalent of the Montana Rule of Civil Procedure set out above. Accordingly, viewing the instant case side by side with *Jaap*, the issues are identical, and the rules on claim of privilege and waiver thereof are identical, although variously located. The general discovery rule 26(a) is practically identical. We perceive no reason why a case from a neighboring state, that is squarely on all fours as to circumstances and applicable law and rules, is not extremely persuasive. Moreover, we are impressed with the Montana court's application of M.R.C.P. 26(a), which is almost identical to I.R.C.P. 26(a). M.R.C.P. 26(a) states:

*Discovery methods.* Parties may obtain discovery by one or more of the following methods: depositions upon oral examination or written questions; written interrogatories; production of documents or things or permission to enter upon land or other property, for inspection and other purposes; physical and mental examinations; and requests for admission. Unless the court orders otherwise under subdivision (c) of this rule, the frequency of use of these methods is not limited.

*Jaap*, 623 P.2d at 1391.

Having not uncovered a case in point from Nevada or Wyoming, the circumnavigation of the bordering states is completed with an examination of an Oregon case which hones in on the confidential relationship which is concomitant with the physician-patient relationship. As was so with Washington's unanimous *Loudon* opinion, the seven justices of the Oregon Supreme Court were unanimous. They agreed upon the holding that a physician's breach of the physician-patient relationship gave rise to a cause of action in the patient. *Humphers v. First Interstate Bank*, 298 Or. 706, 696 P.2d 527 (1985). The action was brought against the bank as the executor of the deceased Dr. Mackey's estate. The underlying facts were stated in the opinion, as was the issue in controversy:

We are called upon to decide whether plaintiff has stated a claim for damages in alleging that her former physician revealed her identity to a daughter whom she had given up for adoption.

In 1959, according to the complaint, plaintiff, then known as Ramona Elwess or by her maiden name, Ramona Jean Peek, gave birth to a daughter in St. Charles Medical Center in Bend, Oregon. She was unmarried at the time, and her physician, Dr. Harry E. Mackey, registered her in the hospital as 'Mrs. Jean Smith.' The next day, Ramona consented to the child's adoption by Leslie and Shirley Swarens of Bend, who named her Leslie Dawn. The hospital's medical records concerning the birth were sealed and marked to show that they were not public. Ramona subsequently remarried and raised a family. Only Ramona's mother and husband and Dr. Mackey knew about the daughter she had given up for adoption.

Twenty-one years later the daughter, now known as Dawn Kastning, wished to establish contact with her biological mother. Unable to gain access to the confidential court file of her adoption (though apparently able to locate the attending physician), Dawn sought out Dr. Mackey, and he agreed to assist in her quest. Dr. Mackey gave Dawn a letter which stated that he had registered Ramona Jean Peek at the hospital, that although he could not locate his medical records, he remembered administering diethylstilbestrol to her, and that the possible consequences of this medication made it important for Dawn to find her biological mother. The latter statements were untrue and made only to help Dawn to breach the confidentiality of the records concerning her birth and adoption. In 1982, hospital personnel, relying on Dr. Mackey's letter, allowed Dawn to make copies of plaintiff's medical records, which enabled her to locate plaintiff, now Ramona Humphers.

Ramona Humphers was not pleased. The unexpected development upset her and caused her emotional distress, worry, sleeplessness, humiliation, embarrassment, and inability to function normally. She sought damages from the estate of Dr. Mackey, who had died, by this action against defendant as the personal representative. After alleging the facts recounted above, her complaint pleads for relief on five different theories: First, that Dr. Mackey incurred liability for 'outrageous conduct'; second, that his disclosure of a professional secret fell short of the care, skill and diligence employed by other physicians in the community and commanded by statute; third, that his disclosure wrongfully breached a confidential or privileged relationship; fourth, that his disclosure of confidential information was an 'invasion of privacy' in the form of an 'unauthorized intrusion upon plaintiff's seclusion, solitude, and private affairs'; and fifth, that his disclosures to Dawn Kastning breached a contractual obligation of secrecy. The circuit court granted defendant's motion to dismiss the complaint on the grounds that the facts fell short of each theory of relief and ordered entry of judgment for defendant. On appeal, the Court of Appeals affirmed the dismissal of the first, second, and fifth counts but reversed on the third, breach of confidential relationship, and the fourth, invasion of privacy. *Humphers v. First Interstate Bank of Oregon*, 68 Or.App. 573, 684 P.2d 581 (1984). We allowed review.

*Humphers v. First Interstate Bank*, 298 Or. at 706–07, 696 P.2d at 527–28. The Oregon Supreme Court on its review first ruled that if plaintiff had a cognizable claim, it arose from Dr. Mackey's breach of a professional duty to honor the confidential relationship which came into existence when the physician-patient relationship was entered into. The court then proceeded with its analysis of available law from which its conclusion would be drawn. In doing so, it brought forth an Idaho case, albeit without comment thereon:

A physician's liability for disclosing confidential information about a patient is not a new problem. In common law jurisdictions it has been more discussed than litigated throughout much of this century. There are precedents for damage actions for unauthorized disclosure of facts conveyed in confidence, although we know of none involving the disclosure of an adoption. Because such claims are

made against a variety of defendants besides physicians or other professional counselors, for instance against banks, *see, e.g., Peterson v. Idaho First National Bank,* 83 Idaho 578, 367 P.2d 284 (1961), and because plaintiffs understandably plead alternative theories of recovery, the decisions do not always rest on a single theory.

Sometimes, defendant may have promised confidentiality expressly or by factual implication, in this case perhaps implied by registering a patient in the hospital under an assumed name.

*Humphers,* 298 Or. at 707, 696 P.2d at 528.

After concluding a discussion which ruled out invasion of privacy as a viable claim, the Oregon Court of Appeals found a viable claim under a breach of confidential relationship theory:

Here there is no claim of offensive publicity. The Court of Appeals concluded that the complaint alleges a case of tortious intrusion upon plaintiff's seclusion, not by physical means such as uninvited entry, wiretapping, photography, or the like, but in the sense of an offensive prying into personal matters that plaintiff reasonably has sought to keep private. *See* Prosser and Keeton, *supra,* at 854–55, § 117. We do not believe that the theory fits this case.

Doubtless plaintiff's interest qualifies as a "privacy" interest. That does not require the judgment of a court or a jury; it is established by the statutes that close adoption records to inspection without a court order. ORS 7.211, 432.-420. The statutes are designed to protect privacy interests of the natural parents, the adoptive parents, or the child. But as already stated, to identify an interest deserving protection does not suffice to collect damages from anyone who causes injury to that interest. Dr. Mackey helped Dawn Kastning find her biological mother, but we are not prepared to assume that Ms. Kastning became liable for invasion of privacy in seeking her out. Nor, we think, would anyone who knew the facts without an obligation of secrecy commit a tort simply by telling them to Ms. Kastning.

Dr. Mackey himself did not approach plaintiff or pry into any personal facts that he did not know; indeed, if he had written or spoken to his former patient to tell her that her daughter was eager to find her, it would be hard to describe such a communication alone as an invasion of privacy. *The point of the claim against Dr. Mackey is not that he pried into a confidence but that he failed to keep one.* If Dr. Mackey incurred liability for that, it must result from an obligation of confidentiality beyond any general duty of people at large not to invade one another's privacy. We therefore turn to plaintiff's claim that Dr. Mackey was liable for a breach of confidence, the third count of the complaint.

. . . .

In the case of the medical profession, courts in fact have found sources of a nonconsensual duty of confidentiality. Some have thought such a duty toward the patient implicit in the patient's statutory privilege to exclude the doctor's testimony in litigation, enacted in this state in OEC 504–1(2). *See, e.g., Berry v. Moench,* 8 Utah 2d 191, 331 P.2d 814 (1958); *Hammonds v. Aetna Cas. & Sur. Co., supra* [243 F.Supp. 793 (N.D.Ohio 1965)] and *cf. Quarles v. Sutherland, supra* [215 Tenn. 651, 389 S.W.2d 249 (1965)] noting the absence of such legislation in Tennessee. More directly in point are legal duties imposed as a condition of engaging in the professional practice of medicine or other occupations.

As early as 1920, the Supreme Court of Nebraska, where a medical licensing statute defined professional misconduct to include 'betrayal of a professional secret to the detriment of the patient,' wrote in *Simonsen v. Swenson, supra,* 104 Neb. [224] at 227, 177 N.W. [831] at 831 [(1920)]:

By this statute, it appears to us, a positive duty is imposed upon the physician, both for the benefit and advantage of the patient as well as in the interest of general public policy. The relation of physician and patient is necessarily a

highly confidential one. It is often necessary for the patient to give information about himself which would be most embarrassing or harmful to him if given, general circulation. This information the physician is bound, not only upon his own professional honor and the ethics of his high profession, to keep secret, but by reason of the affirmative mandate of the statute itself. A wrongful breach of such confidence, and a betrayal of such trust, would give rise to a civil action for the damages naturally flowing from such wrong.

. . . .

The contours of the asserted duty of confidentiality are determined by a legal source external to the tort claim itself.

. . . .

A physician's duty to keep medical and related information about a patient in confidence is beyond question. It is imposed by statute. ORS 677.190(5) provides for disqualifying or otherwise disciplining a physician for 'wilfully or negligently divulging a professional secret.' The Court of Appeals thought that breach of this statutory provision could not lead to civil liability when such liability would be quite inappropriate to provisions of ORS 677.190, but that misses the point. *The actionable wrong is the breach of duty in a confidential relationship;* ORS 677.190(5) only establishes the duty of secrecy in the medical relationship.

*Humphers,* 298 Or. at 715–21, 696 P.2d at 532–35 (footnotes omitted; emphasis added).

The Arizona Court of Appeals, Division 1, in *Duquette v. Superior Court,* 161 Ariz. 269, 778 P.2d 634 (1989), made a thorough analysis of the *ex parte* interview problem and held that defense counsel in a medical malpractice suit may not engage in non-consensual *ex parte* communications with a plaintiff's treating physicians:

### CONCLUSION

Upon review of the numerous countervailing public policy considerations presented on the issue in this case, we conclude that the advantages to be gained in the informal *ex parte* procedure are clearly outweighed by the dangers that procedure presents to the physician-patient relationship as well as by the pressures the procedure brings to bear on the physician and attorney participants. We agree wholeheartedly with the Supreme Court of Washington when it stated that '[t]he unique nature of the physician-patient relationship and the dangers which *ex parte* interviews pose justify the direct involvement of counsel in any contact between defense counsel and a plaintiff's physician.' *Loudon v. Mhyre,* 110 Wash.2d 675, 679, 756 P.2d 138, 142 (1988). Accordingly, based upon the provisions of A.R.S. § 12–2235 and public policy we hold that defense counsel in a medical malpractice case may not engage in non-consensual *ex parte* communications with plaintiff's treating physician.

*Duquette,* 778 P.2d at 642. *Duquette* listed some of the reasons for barring such non-consensual *ex parte* interviews:

Among the reasons relied upon in refusing to grant permission for informal *ex parte* interviews are the broad privacy interest underlying the physician-patient relationship, the potential tort liability of physicians for breach or invasion of privacy, the potential that defense counsel may seek to improperly influence plaintiff's treating physicians or may discourage the physician from testifying, the duty of loyalty from the physician to the patient, and the view that discovery rules determine the extent of the physician-patient privilege.

. . . .

### DISCUSSION: OPPOSING EX PARTE COMMUNICATIONS

Having discussed and rejected the contentions raised by petitioners in support of *ex parte* communications, we proceed to address what we feel are overriding public policy considerations which, when considered in conjunction with our statutory physician-patient privilege, justify a prohibition on *ex parte* communications

between a plaintiff's treating physicians and defense attorneys. Our initial consideration involves the unique nature of the physician patient relationship. That relationship is, first and foremost, a confidential one. *See* M. Udall, *Arizona Law of Evidence* § 93, at 145 (1960). Thus, our legislature perceived a need to protect the confidential nature of the relationship by enactment of a statutory physician-patient privilege. *See* A.R.S. § 12–2235 (1982). The purpose of the physician-patient privilege is to ensure that 'the patient will receive the best medical treatment by encouraging full and frank disclosure of medical history and symptoms by a patient to his doctor.' *Lewin v. Jackson*, 108 Ariz. 27, 31, 492 P.2d 406, 410 (1972). We believe the public has a widespread belief that information given to a physician in confidence will not be disclosed to third parties absent legal compulsion, and we further believe that the public has a right to have this expectation realized. *See Humphers v. First Interstate Bank*, 68 Or. App. 573, 579, 684 P.2d 581, 587 (1984), *aff'd in part, rev'd in part*, 298 Or. 706, 696 P.2d 527 (1985).

Arizona also recognizes that there is a fiduciary relationship between the physician and patient which requires the physician 'to exercise the utmost good faith.' *Hales v. Pittman*, 118 Ariz. 305, 308, 576 P.2d 493, 496 (1978). The physician's fiduciary duty requires that he act in the best interests of his patient so as to protect the sanctity of the physician-patient relationship while, at the same time, complying with court authorized discovery. *See Petrillo v. Syntex Laboratories, Inc.*, 148 Ill.App.3d 581, 591–96, 102 Ill.Dec. 172, 179–82, 499 N.E.2d 952, 959–62 (1986), *cert. denied*, 483 U.S. 1007, 107 S.Ct. 3232, 97 L.Ed.2d 738 (1987). We agree with the *Petrillo* court when, in limiting physician disclosure to court authorized methods of discovery, it stated:

Discussion of the patient's confidences under any other circumstances, such as the *ex parte* conference, could be inconsistent with the duties of a fiduciary for the physician would, in effect, engage in conduct which may be contrary to a fiduciary's obligation of good faith and, in addition, may be potentially harmful to the interests of the patient in that the physician might disclose intimate facts of the patient which are unrelated and irrelevant to the mental or physical condition placed at issue in the lawsuit. Consequently, the *ex parte* conference involves conduct which could be violative of the duties of a fiduciary and would, therefore, be contrary to the public policy favoring the fiduciary nature of the physician-patient relationship.

*Id.* 148 Ill.App.3d at 595, 102 Ill.Dec. at 181–82, 499 N.E.2d at 961–62. We believe that *ex parte* communications between defense attorneys and plaintiffs' treating physicians would be destructive of both the confidential and fiduciary natures of the physician-patient relationship which have been recognized by statutory and case law.

A second set of considerations supporting a prohibition on *ex parte* communications involves the pressure brought to bear on the physician when he or she is faced with a request for an *ex parte* interview by a defense attorney. Although the physician is free to reject such a request and thereby force the defense attorney to utilize formal methods of discovery, we believe that this option does not acceptably reduce the pressure on the physician. A physician may lack an understanding of the legal distinction between an informal method of discovery such as an *ex parte* interview, and formal methods of discovery such as depositions and interrogatories, and may therefore feel compelled to participate in the *ex parte* interview. We also note that in Arizona, a substantial number of physicians are insured by a single 'doctor owned' insurer. Realistically, this factor could have an impact on the physician's decision. In other words, the physician witness might feel compelled to participate in the *ex parte* interview because the insurer defending

the medical malpractice defendant may also insure the physician witness.

An additional factor that must be taken into consideration is that a physician who allows himself to be interviewed *ex parte* embarks, perhaps unknowingly, on a course which may involve a breach of professional ethics and potential liability. First, participation in an *ex parte* interview may constitute a breach of the physician's professional code of ethics. The Hippocratic Oath acknowledges the physician's obligation to keep in trust patient confidences. Further, Principle IV of the American Medical Association's Principles of Medical Ethics requires physicians to 'safeguard patient confidences within the constraints of the law.' Finally, Section 5.05 of the Current Opinions of the Judicial Council of the American Medical Association states that '[t]he information disclosed to a Physician during the course of the relationship between physician and patient is confidential to the greatest possible degree.' It would therefore appear that a physician's ethical obligations preponderate against his participation in *ex parte* interviews.

Second, a physician's disclosure of confidential information during an *ex parte* interview may subject the physician to charges of professional misconduct. A.R.S. § 32–1401.12(b) defines unprofessional conduct for the medical profession to include '[i]ntentional betrayal of a professional secret or intentional violation of a privileged communication except as either act may otherwise be required by law.' A.R.S. § 13–1401.12(b) (Supp. 1988). Thus, the physician's voluntary participation in the *ex parte* interview may subject him or her to professional discipline as well as potential tort liability.

Third, at least in the present case, the physician's participation in a non-consensual *ex parte* interview would not be in accord with the voluntary Guidelines for Cooperation Between Physicians and Attorneys in Maricopa County adopted jointly by the Maricopa County Bar Association and the Maricopa County Medical Society. Section IV(B) of the Guidelines

specifically states that if a lawyer representing the defendant wishes to discuss the case with a treating physician, he should either present that physician with a signed release of medical information authorization or subpoena the physician for deposition. In this case, there was no compliance with Guideline IV(B).

An additional consideration supporting a ban on *ex parte* interviews involves the practical difficulty in determining the scope of the waiver of the physician-patient privilege. The scope of the waiver is often in dispute, and absent court participation in the discovery process, resolution of that dispute is left to the defense attorney and the physician witness. We believe that this scenario places both the defense attorney and the physician in an untenable position.

As the Iowa Supreme Court stated in *Roosevelt Hotel Ltd. Partnership v. Sweeney*, 394 N.W.2d 353, 357 (Iowa 1986):

> Placing the burden of determining relevancy on an attorney, who does not know the nature of the confidential disclosure about to be elicited, is risky. Asking the physician, untrained in the law, to assume this burden is a greater gamble and is unfair to the physician. We believe this determination is better made in a setting in which counsel for each party is present and the court is available to settle disputes.

We believe that resolution of any dispute over the scope of the waiver of the physician-patient privilege should be made in an adversarial as opposed to an *ex parte* setting.

*Duquette*, 778 P.2d at 638, 640–42 (footnotes omitted).

The district court, as noted earlier herein, found Illinois authority unpersuasive, namely *Karsten v. McCray*, 157 Ill.App.3d 1, 109 Ill.Dec. 364, 509 N.E.2d 1376 (2 Dist. 1987), and *Yates v. El–Deiry*, 160 Ill. App.3d 198, 112 Ill.Dec. 105, 513 N.E.2d 519 (3 Dist.1987), both then recent cases. *Karsten* was issued by the Second District Appellate Court on June 26, 1987, and *Yates* was issued by the Third District Ap-

pellate Court less than three months later. They were obviously independently considered and decided, but both courts cited to and relied upon the *Petrillo v. Syntex Laboratories, Inc.* decision which was announced by the First District, Fourth Division Illinois Appellate Court on June 26, 1986, exactly one year prior to issuance of the *Karsten* opinion. 148 Ill.App.3d 581, 102 Ill.Dec. 172, 499 N.E.2d 952 (1986), *appeal denied* 1987, 113 Ill.2d 584, 106 Ill.Dec. 55, 505 N.E.2d 361. The Idaho district court stated no reason for not citing all of those three contemporaneous opinions each from a separate Illinois appellate court. Counsel for both plaintiffs and defendants had utilized *Petrillo* in memorandum briefs submitted to the district court. It is reasonable to believe that *Petrillo*, too, would have been rejected as not supporting the conclusion "that a party may not obtain through informal means what would be available through formal discovery," as the district court remarked in rejecting the rationale of the other two Illinois cases. We have perused all three opinions and find each to be supportable and well supported in logic and by applicable case law precedent. *Petrillo*, we note as a matter of interest, does tend to support the district court in espousing the rationale of *Doe v. Lilly* that "no party to litigation has anything resembling a proprietary right to any witness's evidence ... no party is entitled to restrict an opponent's access to a witness." *Doe v. Lilly*, 99 F.R.D. at 128. The *Petrillo* opinion states, "[w]e agree with Tobin [the Syntex attorney and contemnor-appellant] that no person owns the testimony of another." *Petrillo*, 102 Ill.Dec. at 185, 499 N.E.2d at 965. In making that concession, Justice Linn, speaking for the court, went on to say:

> But our decision to bar *ex parte* conferences in no way advances or supports such a conclusion. Again, we are not prohibiting a treating physician from expressing his opinions in a deposition or from testifying in a court of law. Nor does our decision infer that a plaintiff has a right to stop his treating physician from so testifying. In addition, it is obvious that a plaintiff, like a defendant, has no right to influence the opinion of the treating physician. That being the case, it is evident that we are not, through our decision to bar *ex parte* conferences between defense counsel and a plaintiff's treating physician, granting a plaintiff a proprietary right in the testimony of his treating physician. To the contrary, we are merely imposing a prohibition on a single type of unauthorized practice which we believe not only jeopardizes the fiduciary relationship between a treating physician and his patient, but also, yields up no recognizable benefit with regard to the information and evidence obtained through its use.

*Petrillo*, 102 Ill.Dec. at 185, 499 N.E.2d at 965. The *Petrillo* court also dealt with the contention that a defense attorney has a right to engage in *ex parte* conferences with a plaintiff's treating physician:

> We likewise are compelled to reject Tobin's claim that he is permitted, under the Illinois Code of Civil Procedure, to engage in *ex parte* conferences with a plaintiff's treating physician. Tobin repeatedly asserts that he has a 'right' to engage in *ex parte* conferences with a plaintiff's treating physician but fails to identify the rule or statute which grants him that right. Tobin apparently believes that defense counsel are permitted to engage in *ex parte* conferences with plaintiff's treating physician merely because the Illinois Rules of Civil Procedure do not explicitly prohibit such. We find this position flawed.
>
> The Illinois Rules of Civil Procedure do not specifically address whether defense counsel should be permitted to engage in *ex parte* conferences with a plaintiff's treating physician. Nevertheless, we believe that the legislature's position on this can be gleaned from an analysis of the physician-patient privilege statute.
>
> In creating the physician-patient privilege, the legislature recognized that members of society who approach a physician for treatment should, and do, have a right to be free from the embarrassment and invasion of privacy that often

accompanies the disclosure of confidential medical information. (*See, People v. Bickham* (1982), 89 Ill.2d 1, 59 Ill.Dec. 80, 431 N.E.2d 365.) This right however, is not absolute and the statute accordingly, contains several exceptions wherein the legislature deemed that the protection afforded by the physician-patient privilege ought give way to the public's desire to ascertain the truth. (*See* Ill. Rev.Stat.1983, ch. 110, par. 8–802(1–8).) Thus, for example, when an individual files suit and places his mental or physical condition at issue, that individual implicitly consents, by filing that lawsuit, to a waiver of the physician-patient privilege as to that specific mental or physical condition. (*Webb v. Quincy City Lines, Inc.* (1966), 73 Ill.App.2d 405, 219 N.E.2d 165.) Consequently, the patient-turned-plaintiff cannot object to the release of medical records regarding the condition, to his treating physician giving testimony regarding the condition, and even, where appropriate, to being physically examined by a physician employed by his adversary concerning the condition at issue.

The privilege and the relevant exceptions applicable thereto (# 2, 3 and 4) reflect a sound public policy which respects both society's desire for privacy and its desire to see that the truth is reached in civil disputes. (*Parkson v. Central DuPage Hospital* (1982) 105 Ill. App.3d 850, 61 Ill.Dec. 651, 435 N.E.2d 140.) Of key importance is the legislature's determination that it be the patient who, by affirmative conduct, (the filing of a lawsuit) consents to the disclosure of his previously confidential medical information. Thus, members of the public who file suit regarding a specific condition realize that upon doing so, the information regarding *that* condition will be lawfully disclosed not only to their adversary, but to the public forum as well.

However, we do not believe, and there is no evidence to suggest, that the legislature, by creating a consensual waiver of the physician-patient privilege, intended that a member of the public also consents, by simply filing suit, to his treating physician engaging in *ex parte* conferences with the attorneys representing that individual's legal adversary. We are unwilling to accept the proposition that the legislature intended the consensual waiver of the physician-patient privilege (*see,* Ill.Rev.Stat.1983, ch. 110, par. 8–802(4)) to apply to anything more than the information necessary to ascertain the truth.

It is significant to note, as we stated above, that in creating the physician-patient privilege and the relevant exceptions thereto, the legislature was concerned with balancing society's interest in maintaining a confidential relationship between a patient and his physician with society's interest in ascertaining the truth in civil lawsuits. With that being the case, we are unable to discern how *ex parte* conferences would, in any way, act to foster either of those societal interests. As mentioned previously, there is no suggestion that Tobin, using the regular channels of discovery, is unable to obtain all of the relevant medical information and evidence that he is entitled to receive. Thus, society's interest in ascertaining the truth in civil disputes is wholly satisfied. Society's interest in preserving the confidential nature of the physician-patient relationship is, through our decision to bar *ex parte* conferences, also fostered for members of the public who look to the court system for justice will know that although they have consented to the release of information regarding the condition placed at issue, they have not, by instituting litigation, automatically consented to a complete breakdown of the trust and confidentiality embodied in the physician-patient relationship.

In sum, we believe that when a person files suit and places his mental or physical condition at issue, that person consents to the release of all of the information related to the condition placed at issue. *We do not believe, however, that the legislature intended that a person also consents, by filing a lawsuit, to his treating physician engaging in ex parte*

*conferences with that person's legal adversary.*

*Petrillo,* 102 Ill.Dec. at 186–188, 499 N.E.2d at 966–68 (emphasis added).

Tending to nullify any efficacy which the district court observed in *Doe v. Lilly,* 99 F.R.D. 126, there was a later opinion issued out of the United States District Court for the District of Columbia, *Alston v. Greater Southeast Community Hosp.,* 107 F.R.D. 35 (1985), authored by Senior United States Magistrate, Arthur L. Burnett. Basing his reliance on *Doe v. Lilly,* counsel for the defendant Hospital moved the court for an order compelling plaintiff Charles Alston to provide executed medical authorizations confirming that plaintiff had fully waived the physician-patient privilege by the bringing of a personal injury action predicated on negligence and medical malpractice. The extent of the authorizations was contended to authorize all physicians who had examined, treated, or consulted with plaintiff not only to furnish copies of all existing written records in their possession, but also to make themselves available for interviews by defense counsel without counsel for the plaintiffs being present.

In addition to relying upon *Doe v. Lilly,* the defendant Hospital relied upon another District of Columbia case, *Sklagen v. Greater Southeast Community Hosp.,* 625 F.Supp. 991 (D.D.G. March 20, 1984), heard before Judge Corcoran, plus another federal case, *In re Agent Orange Prod. Liab. Litig.,* 91 F.R.D. 616 (D.C.N.Y.1981). The opinion then points out that, relying on *Doe* and *Sklagen,* Senior Judge Oliver Gasch reached a similar result in *Farenga v. Georgetown University,* C.A. No. 84–1885, June 3, 1985. Judge Burnett stated that the named authorities, and two other cases from the same federal court, constituted an array of formidable arguments and authorities supporting *ex parte* interviews, but also that plaintiff presented substantial arguments for disallowing defense counsel from engaging in personal interviews with the plaintiff's treating physicians.

Judge Burnett took note of plaintiff's argument that the specific issue had not been decided by any of the appellate courts of the District of Columbia, but that there was a recent District of Columbia appellate court decision, *Vassiliades v. Garfinckel's,* 492 A.2d 580 (D.C.App.1985), which although distinguishable, indicated that *there is a confidential and fiduciary relationship existing between a doctor and patient, which must be respected.* Judge Burnett, in a commendable intellectual move, seems to have eschewed rote federal district court rationales, and turned to the plaintiff's citation of *Wenninger v. Muesing,* 307 Minn. 405, 240 N.W.2d 333 (1976), for its cogently expressed rationale for precluding informal interviews, quoting from *Wenninger* as follows:

[It] protects both the patient and his physician from the danger that adverse counsel may abuse his opportunity to interrogate the physician by privately inquiring into facts or opinions about the patient's mental and physical health or history which may neither be relevant to the patient's lawsuit nor lead to discovery of admissible evidence. In a formal deposition ... the presence of a patient's counsel and the availability of protective orders assure that clearly irrelevant medical testimony will not be elicited. 240 N.W.2d at 336–37.

*Alston,* 107 F.R.D. at 37. To that Judge Burnett added his own views:

Furthermore, when counsel for the plaintiff is present at a formal deposition, the physician can rely upon that counsel to keep the questioning and his answers relevant to the matters properly at issue in the lawsuit. It must be remembered that doctors are not normally trained in the law. Counsel for the plaintiff has also cited *Weaver v. Mann,* 90 F.R.D. 443 (D.N.D.1981), where the court concluded that 'the practice of engaging in private conversations with plaintiff's physicians is not contemplated by the rules.' 90 F.R.D. at 445.

See also *Garner v. Ford Motor Co.,* 61 F.R.D. 22 (D.Alaska 1983), where the court held that under the Federal Rules of Civil Procedure, discovery of information from a plaintiff's attending physician must be in accord with the discovery rules and not 'by means of private con-

versations between a defendant's attorneys and a plaintiff's attending physician.' 61 F.R.D. at 24. Counsel for the plaintiffs has also relied upon *Miles v. Farrell*, 549 F.Supp. 82 (N.D.Ill.1982), where the court observed that as a general rule, a treating physician may not discuss his patient's medical condition with opposing counsel except pursuant to discovery authorized under the applicable rules of civil procedure, noting that such informal contacts can lead to unseemly situations in which a patient's treating physician, or other doctors associated with him, is placed in an adversary position as an expert witness against the plaintiff. Such a situation not only results in a clear conflict of interest, but could compromise the course of treatment being provided to the plaintiff as a patient, when the treating physician becomes an expert witness for a defendant hospital or a defendant doctor.

At oral argument on July 16, 1985, counsel for the plaintiff presented an additional factor to be considered. Treating or consulting physicians who have dealt with a patient after his alleged injury or trauma may be potential third-party defendants for indemnity or contribution if that doctor's treatment has exacerbated the patient's condition or may have been an intervening or superseding cause for his present complaints. Further, the *ex parte* interviews could put a lawyer in the potential role of being a witness as to a damaging admission by a doctor or as an impeachment witness, should a doctor give testimony different significantly from what he told the lawyer in the informal interview.

Even those courts which have allowed informal interviews and conversations have recognized that a doctor cannot be required to submit to the interview. For example, in *Farenga v. Georgetown University, supra*, Judge Gasch observed:

Of course, it is within the discretion of plaintiff's treating physicians to decide whether to disclose to defendant's counsel in *ex parte* interviews medical information about the plaintiff that is relevant to the subject matter of this action.

If this is so, it would seem to be a futile act to require the patient to sign an authorization allowing oral interviews, especially if counsel for the plaintiff can contact the physicians and advise them that notwithstanding the medical authorizations signed by the plaintiff, the doctor has the discretion to decline to be interviewed or to give any oral information except by formal deposition. It is doubted that the Court can 'gag' counsel from correctly stating the law to the patient-plaintiff's treating and consulting physicians. Since compelling the plaintiff to provide medical authorizations allowing *ex parte* oral interviews can thus come to naught, and in reality amount to a vain act, and because of the cogent reasons advanced for formal depositions of physicians who have treated a plaintiff or have been consulted in the course of treatment, it is the considered view of this Magistrate that the motion to compel should be denied.

For the foregoing reasons, it is now hereby this 19th day of July, 1985, ORDERED that the defendant Greater Southeast Community Hospital's motion to compel discovery of plaintiff Charlie Alston be and is hereby DENIED.

*Alston*, 107 F.R.D. at 37–39 (footnotes omitted).

Dr. Ollie contends that once a patient places his or her condition in issue, the physician-patient privilege is waived. I.C. § 9–203(4)(C); I.R.E. 503(d)(3). However, the instant case goes far beyond simply obtaining medical records or information concerning treatment. Here the defense attorneys explicitly retained Mr. Pearce's treating physicians as medical expert witnesses for the defense. The implied waiver by filing an action for personal injuries means that the holder of the privilege waives *"only* his right to object to discovery of pertinent medical information which is sought through the formal methods of discovery authorized by the applicable Rules of Civil Procedure." *Duquette*, 778 P.2d at 637 (emphasis in original) (citations omitted).

An excellent example of the type of unacceptable conduct which could be expected to result from violations of the physician-patient confidential relationship is well portrayed in *Miles v. Farrell*, 549 F.Supp. 82 (N.D.Ill.1982):

MEMORANDUM OPINION AND ORDER

GETZENDANNER, [United States] District Judge.

The issue before the court is whether the court properly may bar the testimony of Dr. John T. Flynn who treated the plaintiff, a blind child, both before and after he was retained as an expert by one of the defendants, without disclosing his relationship with the defendant.[1]

The facts are as follows: On August 17, 1978, the plaintiff's parents were deposed. Two attorneys representing Dr. William Farrell, one of the defendants, were present at the deposition. These attorneys were John Caffery and Joyce Lewis from the law firm of Claussen, Miller, Gorman, Caffrey & Witous. During the depositions, eight times the parents testified that the plaintiff Troy Miles had been seen and treated at the Bascom Palmer Clinic.

Two weeks later, on August 31, 1978, Mr. Caffrey telephoned Dr. John T. Flynn of the Bascom Palmer Clinic. On September 5, 1978, Ms. Lewis conferred with Dr. Flynn and requested that he act as a consultant on behalf of Dr. Farrell 'for the purpose of reviewing the records in this subject law suit and possibly testifying as an expert witness at trial.' (Lewis Affidavit) Dr. Flynn agreed to act as the defendant's expert on or about January 26, 1979, after he had received Troy Miles's medical records from Dr. Farrell's attorneys.

After being contacted by the defendant's attorneys and before accepting employment as Dr. Farrell's expert, Dr. Flynn examined Troy Miles at Bascom Palmer Institute as a treating physician. After accepting employment as defendant's expert, on February 12, 1979, Dr. Flynn, *in his capacity as treating physician*, hospitalized Troy Miles at the Bascom Palmer Institute and performed an examination under general anesthesia. At no time did Dr. Flynn reveal to the plaintiff's parents any of the facts relating to his involvement with one of the defendants in this case.

On January 13, 1982, Dr. Farrell's attorneys disclosed Dr. Flynn as an expert witness on behalf of the defendant. On February 22, 1982, Dr. Flynn again hospitalized Troy Miles at the Bascom Palmer Institute, ordered ultrasound and an electrocardiogram, and examined Troy Miles under general anesthesia. On or about March 26, 1982, one of the plaintiff's attorneys contacted Dr. Flynn concerning his dual status as treating physician and expert witness for defendant.[2]

The defendant persists in his argument that he should be entitled to call Dr. Flynn to testify as an expert, including his treatment of Troy Miles, and his consultations with Troy Miles's parents in his capacity as treating physician. The defendant argues that any doctor/patient privilege which requires Dr. Flynn to honor his patient's privacy is waived by the fact that Troy Miles filed this lawsuit which puts his medical condition at issue. (This is a suit against a hospital and a doctor for medical malpractice.) The defendant further argues that Dr. Flynn owes no cognizable fiduciary duty to Troy Miles which might prevent him from testifying as a defendant's expert.

---

1. The court received a letter and numerous telephone calls from Dr. Flynn asking that the court determine whether or not he may act as an expert for the defendant. The court did not discuss the issues with the doctor but instead asked the parties to brief the issue. However, the plaintiff now seeks an order barring the doctor's expert testimony.

2. There is nothing in the record which explains the circumstances under which Dr. Flynn was permitted to treat Troy Miles in February of 1982, after Dr. Flynn had been disclosed as a defendant's expert. I assume that the plaintiff's parents were not advised of Dr. Flynn's role as defendant's expert. If the parents were aware of Dr. Flynn's conflict and consented to the February, 1982, treatment, the court should be made aware of those facts.

Dr. Flynn wants to testify; he informed the court that 'I see my role as testifying as an expert witness, and qualified to speak on the scientific known and unknowns in cases of retrolental fibroplasia.' (Dr. Flynn's letter to the court.) Dr. Flynn assures the court that he did not knowingly act as both expert and treating physician.[3] Arguments similar to the defendant's arguments in this case were rejected by the Circuit Court of Cook County in *Barkin v. Skokie Valley Community Hospital*, 76 L 23428. In that case the defense attorneys (who were from the same law firm as the defense attorneys for Dr. Farrell in this case) contacted the plaintiff's treating physician and conferred with him with respect to his acting as a defense expert. The court held that the doctor owed his patient a duty of confidentiality, fiduciary in nature, in extra-judicial communications and that notwithstanding the existence of the medical malpractice litigation filed by the plaintiff, the doctor/patient privilege protected the patient against any disclosures not sanctioned or permitted by the Illinois privilege statute (Ill.Rev.Stat. ch. 51, § 5.1) or by the rules of discovery of the Illinois Civil Practice Act. On June 22, 1982, Judge James E. Murphy entered an order barring a treating physician from acting as an expert for the defendants and directing the defense attorney to destroy all notes of his private contact and conference with the treating physician.

I agree with the Circuit Court's analysis and to the extent I must follow Illinois law on state law privileges, the opinion is binding. Dr. Flynn owes a fiduciary duty of confidentiality to his patient. As a general rule, a treating physician may not discuss his patient's medical condition with opposing counsel except pursuant to discovery authorized under the applicable rules of civil procedure.

The other side of the coin relates to the conduct of lawyers. Counsel should not contact a treating physician except pursuant to authorized discovery. A necessary corollary rule is that lawyers should not contact doctors affiliated or associated with a treating physician without full disclosure of all relevant facts so that the doctor may avoid the kind of situation that occurred in this case. *No lesser standard of conduct for attorneys is even arguable.*

In addition to owing a fiduciary duty of confidentiality, as an expert employed by the defendant, Dr. Flynn had a clear conflict of interest which he had an obligation to disclose to his patient. He failed to make a proper disclosure and it is not relevant that his failure was unintentional. It is also likely that a physician owes a duty of loyalty to his patient which would prevent him from testifying as an expert against his patient. (Although Dr. Flynn might argue that his testimony will only be the truth and may not be adverse to his patient, the mere fact that he takes the stand as an expert employed by the defendant assures that his position is adverse to that of his patient.) However, the parties have not briefed this issue and I do not believe it is necessary to rule on the basis of what I perceive to be a physician's duty of loyalty and Dr. Flynn's willingness to breach that duty.

Under the circumstances of this case, *the appropriate sanction is to bar any defendant from calling Dr. Flynn to testify in any capacity.* Accordingly, the Court hereby orders that Dr. Flynn shall not be called to testify by any of the defendants in this case.

*Miles*, 549 F.Supp. at 83–85 (emphasis added).

---

3. The attorneys for defendant apparently did not inform Dr. Flynn that the plaintiff was a patient at the Bascom Palmer Institute, with which Dr. Flynn was affiliated, at the time they first contacted Dr. Flynn. Had they informed Dr. Flynn, he would have been conscious of the fact that the Troy Miles he was about to treat and was treating was the same Troy Miles who was the plaintiff in the lawsuit in which Dr. Flynn was to testify as a defense expert. Considering the fact that just two weeks before they contacted Dr. Flynn the attorneys were present at the plaintiff's parents' deposition and learned that the plaintiff was a patient at the Clinic, *the attorneys' apparent failure to give full information to Dr. Flynn is inexcusable.*

This concludes our discussion of the claimed right of defense counsel to conduct non-consensual *ex parte* interviews of plaintiff's treating physicians, and, in this particular case retaining them as expert witnesses for the defense. We note, however, that for over a century of statehood, and prior to that for over thirty years of territorial existence, it appears that no one has ever advanced the philosophy that defense counsel could elect to ignore the patient-physician confidential relationship, until now. That remarkable history in and of itself, were there not abundant case law precedent available, could very well suffice to uphold our persuasion that the patient-physician relationship, and all other relationships involving either implicit or explicit confidentiality may not be violated with impunity.

## CONCLUSION

The district court erred in concluding that *Doe v. Eli Lilly & Co.*, 99 F.R.D. 126 (D.D.C.1983), *Karsten v. McCray*, 157 Ill.App.3d 1, 109 Ill.Dec. 364, 509 N.E.2d 1376 (1987), and *Yates v. El Deiry*, 160 Ill.App.3d 198, 112 Ill.Dec. 105, 513 N.E.2d 519 (1987) represent the law which this jurisdiction should apply to the factual circumstances of the instant case. Abundant sound precedential case law hereinabove discussed militates against allowing defense counsel to indulge in nonconsensual *ex parte* interviews with a medical malpractice plaintiff's treating physicians and surgeons. Likewise, in accordance with that case law precedent. Defense counsel acted improperly in retaining or attempting to retain such physicians as expert witnesses for the defense.

The district court's entry of judgment in favor of Dr. Ollie is reversed; the denial of plaintiffs' motion for a new trial is reversed; the district court's denial of plaintiffs' motion for an *in limine* order is reversed; the cause is remanded for a new trial solely against defendant Dr. Ollie.

(Emphasis added.)

The district court's written memorandum decision, hereinabove set out, serves to il-

lustrate what was basically the crux of and reason for the Pearces' appeal, which has been summarily dismissed. The majority opinion furnishes nothing to the trial bar over and above that which was written by Judge McKee, and appears to be meaningless. Judge McKee was called upon to decide the controversy, and he did so. Had there been no challenge to his ruling, there would have been no appeal. But there was an appeal brought specifically to challenge his ruling. So viewed, the majority who speak for the Court are casting in stone for not just this one case, but *all* future similar cases the case precedent ruling of *Doe v. Eli Lilly & Co.*, 99 F.R.D. 126 (D.C.C.1983). This will erupt into an abrupt and drastic change from prior Idaho law existing since before statehood, and is in derogation of the plain language of the Idaho Code.

The Pearces cannot be said to have received due process of law when their appeal to this Court is bypassed by the majority's expedient fashioning of its own contention that the appeal should have been dismissed, and then ruling in accord with its own motion. Assuming that the appeal should have been dismissed leaves questions: "Why, oh why, was it not dismissed? Who should have sought the dismissal?" As with all litigants, the Pearces were possessed of a right to appeal an adverse decision. They have exercised that right, but long after oral argument find three members of the Court dismissing their appeal, on a ground raised belatedly and *sua sponte*, whereas the clerk of court could have been issuing an opinion which either found error on the part of Judge McKee and reversed, or found no error on the part of Judge McKee and affirmed.